**In re Anonymous No. 99 D.B. 84**

Disciplinary Board Docket No. 99 D.B. 84.

HILL, *Member,* December 11, 1991—Pursuant to Rule 218(c)(5) of the Pennsylvania Rules of Disciplinary Enforcement, the Disciplinary Board of the Supreme Court of Pennsylvania submits its findings and recommendations to your honorable court with respect to the above captioned petition for reinstatement.

## HISTORY OF PROCEEDINGS

Petitioner, [ ], was disbarred by Supreme Court order dated December 3, 1984. Petitioner was disbarred by consent after he submitted a statement of resignation, in accordance with Rule 215 Pa.R.D.E., on November 21, 1984. Petitioner tendered his resignation after his October 4, 1984, conviction for four counts of mail fraud, in violation of 18 U.S.C. §§1341 and 1342, for which he served three months at [ ] Federal Prison Camp, received five years probation, performed 1,500 hours of community service, and paid a $4,000 fine.

On March 26, 1990, petitioner filed a petition for reinstatement and a reinstatement questionnaire.

The matter was referred to Hearing Committee [ ], which was chaired by [ ] and included [ ] and [ ].

On October 2, 1990, the parties entered into a lengthy factual stipulation concerning the misconduct which

had led to petitioner's disbarment and his subsequent rehabilitation.

The committee held a hearing on the petition for reinstatement on October 3, 1990.

On November 16, 1990, petitioner submitted a brief to the Hearing Committee in support of his petition.

On January 31, 1991, Hearing Committee [   ] filed its report and unanimously recommended that petitioner be reinstated to the bar.

The matter was adjudicated at the March 1991 meeting of the Disciplinary Board of the Supreme Court of Pennsylvania.

## FINDINGS OF FACT

We adopt the findings of fact which are contained in the report of Hearing Committee [   ] and are amply supported by the documentary and testimonial evidence offered by petitioner.

(1)   [   ], petitioner, was born on July 13, 1950. He is married, has an 8-year-old adopted son, and resides with his family in [   ].   He has been described as a loving, compassionate husband and devoted father, and one who freely rendered assistance to people in the community in times of distress.

(2)   Petitioner received his Bachelor of Science degree from the [   ] University in June 1972, and his Juris Doctor decree from the [   ] Law School of [   ] University in August 1975.

(3)   On April 26, 1976, petitioner was admitted to the bar of the Supreme Court of Pennsylvania.

(4) On August 27, 1976, petitioner was also admitted to the U.S. District Court for the [   ] District of Pennsylvania.

(5) Upon his admission to the bar in April 1976 and until March 1979, petitioner was employed by the [A] and [B] Mutual Insurance Cos., local [   ] insurance carriers, as staff attorney to their house counsel.

(6) From March 1979 to July 1982, petitioner was employed as an associate at the offices of [C], P.C., a plaintiff's personal injury law firm in [   ].

(7) From July 1982 until his resignation from the bar in November 1984, petitioner was a partner in the law firm of [petitioner] & [D], P.C., in [   ].

(8) On November 21, 1984, petitioner voluntarily resigned from the bar pursuant to Pa.R.D.E. 215 and was disbarred on consent by order of the Supreme Court of Pennsylvania effective December 3, 1984.

(9) Subsequently, petitioner was disbarred from the U.S. District Court for the [   ] District of Pennsylvania on the basis of reciprocity.

(10) On March 22, 1990, petitioner filed a petition for reinstatement to the bar of the Supreme Court of Pennsylvania accompanied by a reinstatement question-naire. A hearing on the petition was held on October 3, 1990, before Hearing Committee [   ].

(11) The acts which led to petitioner's resignation and disbarment occurred while he was employed at the [C] law firm.

(12) Petitioner was first hired by [C] in March 1979 as an associate at a salary of $250 per week. Petitioner's immediate and only supervisor was [C].

(13) In January 1980, petitioner was appointed office manager by [C] and his salary was increased to $400 per week. As office manager, petitioner's adminis-trative responsibilities included check-signing and the handling of insurance settlements following the receipt of all medical and other relevant information concerning

plaintiff-clients. While serving as office manager, petitioner learned that [C] was paying non-lawyers or "runners" to bring in accident cases to the firm and, in fact, he made the payments to the persons he knew to be runners himself. Despite the fact that he knew it was unethical to pay referral fees to non-lawyers, he initially did nothing to either question [C] about this practice or otherwise attempt to put a stop to it. On the contrary, although he did not make the arrangements for the runners to bring in the cases, he actively participated in the process by cutting the checks to the runners.

(14) Additionally, during the summer of 1980, approximately six months after he was appointed office manager, petitioner began to become suspicious about the validity of certain personal injury cases in the office. Petitioner noticed that out of approximately 700 to 800 files in the office—the vast majority of which were valid and genuine accident cases—an unusual number involved hit-and-run accidents with exactly three plaintiffs, that the same plaintiffs were sometimes included in different accidents, and that most of these unusual cases had been referred to [C] by the same three individuals, the runners previously referred to. Over time, petitioner became increasingly aware that [C] and his employee, a paralegal named [E], were defrauding insurance companies by orchestrating fictitious accident claims. Despite this increasing level of knowledge of unethical and illegal conduct on the part of [C] and his paralegal, [petitioner] neither promptly left the employ of [C] nor reported the conduct to the appropriate authorities.

(15) In October or November 1981, petitioner's suspicions were confirmed when he learned from a defense lawyer that a defendant had admitted she had been

paid money to falsely confess that she had struck a vehicle occupied by three plaintiffs represented by the [C] firm. Petitioner did confront [C] with this information; was told to get out if he did not approve; and decided to leave the firm. However, it was not until July 1982, nine or ten months later, that he actually left.

(16) During that period of time, petitioner assuaged his own concerns about the ongoing illegal and unethical conduct of the firm by refusing to do "legal work" on the personal injury cases assigned to him by [C] if he felt that their validity was questionable. However, he continued to sign payment checks to runners and to "process" all accident claims assigned to him by [C], e.g., by submitting accident claims to insurance companies as opposed to instituting formal legal actions in court.

(17) Although he now clearly recognizes that the rationalization was wrong, petitioner reasoned at the time that he was not culpable for any wrongdoing since he was just an employee following his employer's instructions, was not personally profiting from [C's] fraud (other than the payment of his salary), and was not doing any "legal work" on the fictitious accident cases.

(18) During his employment at the [C] firm, petitioner was compensated only by salary which increased annually by $150 per week. In January 1981, petitioner's salary was increased to $550 per week; and, in January 1982, his salary was increased to $700 per week. He did not, however, receive any more direct financial benefit from the fraud perpetrated by Messrs. [C] and [E].

(19) When petitioner left the [C] firm to open his own law practice in July 1982, he was unaware that the [C] firm was under criminal investigation. In ad-

dition, when he told [C] he was leaving, [C] threatened to have him "eradicated from the face of the earth." Thus, petitioner voluntarily and completely removed himself from further association with [C's] fraud scheme on his own initiative and not as the result of discovery by others.

(20) Prior to his actual indictment in July 1984, petitioner did not know he was under criminal investigation. Once he was indicted, petitioner immediately pledged his cooperation to the government and accepted full responsibility for his limited role in the insurance fraud scheme by agreeing to the government's plea offer. Thereafter, petitioner pleaded guilty on October 4, 1984, in the U.S. District Court for the [    ] District of Pennsylvania to four counts of aiding and abetting a mail fraud in violation of 18 U.S.C. §1341-2 (Criminal no. 84-00305-02).

(21) The recorded testimony of [F], Esq., the former assistant U.S. attorney who prosecuted petitioner, was presented at the reinstatement hearing. [F] confirmed that petitioner "cooperated fully with the government" in its investigation of insurance fraud and that she "could depend on [petitioner] to appear when and wherever requested." [F] also verified that petitioner's testimony at [C's] criminal trial was "truthful and credible" and "instrumental" in obtaining his conviction.

(22) The prosecutor also confirmed that petitioner did not profit from or orchestrate the insurance fraud scheme, that petitioner had no way of detecting or knowing which cases were illegitimate, and that petitioner's culpability was unlike that of [C] and [E] because petitioner "was, in all respects, an employee of the [C] law firm who performed acts and functions pursuant to the directions" of his employers, who "took advantage of [petitioner's] industriousness" in managing

the law office. Significantly, in the prosecutor's judgment, given petitioner's remorse and complete cooperation, his conduct can be viewed as a "situational ... one-time lapse" that is unlikely to ever be repeated.

(23) On December 19, 1984, the Honorable [G] sentenced petitioner to a one-year prison term, with release as if on parole after four months. Subsequently, on April 15, 1985, Judge [G] reduced and modified petitioner's sentence and ordered that he be released as if on parole after serving three months at [    ] Federal Prison Camp. (By comparison, [C] received a six and one-half year prison sentence for orchestrating the insurance fraud scheme.)

(24) After his release on parole—at a time when he was no longer required to cooperate with the government and could derive no benefit therefrom—petitioner continued to volunteer information to the government when he came across instances of possible insurance fraud by others.

(25) As part of the sentence, petitioner was also placed on probation for a period of five years, directed to perform 1,500 hours of community service to the [    ] Child Guidance Clinic, and fined a total of $4,000 plus costs.

(26) Petitioner has paid in full the fine and costs assessed against him, conscientiously completed his community service obligation, and served without incident the term of probation, which was terminated early in light of petitioner's "excellent adjustment to supervision."

(27) Petitioner practiced law for two years from the time he left the [C] firm until his indictment in July 1984. During that time period, when he was free of [C's] influence but did not know about the criminal investigation, petitioner conducted his practice with un-

questioned integrity, never paid "runners" to bring in cases to the firm and, on occasion, refused to further represent or be associated with any clients when doubts arose about the genuineness and validity of their claims.

(28) Other than matters involving the [C] firm that led to his resignation from the bar, petitioner had no prior history of misconduct and was considered a hardworking, competent and ethical attorney by his colleagues and clients.

(29) Upon his resignation from the bar, petitioner complied with the notice requirements of the Rules of Disciplinary Enforcement. Since then, he has not engaged in the practice of law nor in any illegal, unethical or improper conduct.

(30) Since his resignation from the bar, petitioner has been employed as office administrator, investigator and paralegal at the law firm of [D], P.C., his former partner, in [   ]. [D] testified at the reinstatement hearing that petitioner provides assistance to him in areas that do not involve client contact, such as research and the drafting of legal documents. In addition, [D] testified that when suspicions arise about the validity or genuineness of a personal injury case, petitioner is adamant about avoiding the slightest appearance of impropriety and insists that [D] withdraw from the representation.

(31) Since being awarded a real estate salesperson license by the state of [   ] in early 1986, petitioner has also been employed on a part-time basis as a sales associate for [H] and Associates Inc., realtors, in [   ]. [H] testified at the reinstatement hearing that petitioner has attended all sales meetings and cooperated with other brokers and agents in the office. In addition, [H] testified that he is aware of no complaints with

respect to petitioner's adherence to the real estate code of ethics.

(32) Even though he has fulfilled the community service obligation imposed as part of his sentence and is no longer required to donate his time to the [ ] Child Guidance Clinic, petitioner still continues to volunteer his services to the clinic every week. [I], the clinic's director, testified at the reinstatement hearing that petitioner is very conscientious and dependable, and is relied upon by the other staff members for help every Friday when he renders service to the clinic.

(33) In the years preceding his resignation from the bar, petitioner had also participated in community service organizations, including the Special Olympics, Big Brothers and Children's Bureau of [ ].

(34) Finally, since 1987, petitioner has also been an active volunteer in the [ ] Little League, where he serves as a member of the Board of Directors in charge of organizing and supervising the rookie division of the baseball program.

(35) An independent psychological evaluation of petitioner was performed on September 10, 1990, by [J], the senior psychologist for the Court of Common Pleas in [ ] County. According to [J], who testified at the reinstatement hearing, petitioner does not exhibit any indicia of mental disorder and there is no psychological impediment to his resuming the practice of law.

(36) [J] had also previously evaluated petitioner in connection with his sentencing in 1984 to ascertain what motivating factors led to his participation in [C's] scheme. [J] concluded that the motivating psychological factor was a misguided or "inappropriate loyalty" that made him naively trust [C], petitioner's employer and dominant authority figure. [J's] prognosis in 1984

was that petitioner was most unlikely to ever again engage in illegal activity because he was not criminally oriented, had cooperated with authorities to help convict the motivating force behind his conduct and had realized the error of his ways since leaving the [C] firm by undergoing an "emotional bath" or "cleansing."

(37) [J's] original prognosis in 1984 was confirmed in 1990 when he tested and re-evaluated petitioner.

According to [J]:

"It [the testing] indicates to me that the socializing lifestyle that I predicted in '84 is well ingrained at the present time, and this is a predictor for future behavior. [Petitioner] is not expected from a psychological standpoint to ever again engage in any kind of dissocial activity.

"[Petitioner] has no significant pathological factors that would effect [sic] his professional judgment or would lead him astray if he were to take responsibility as an attorney.... From a psychological standpoint then it is felt that the community would not suffer nor the profession of law would suffer if [petitioner] were to be reinstated as a lawyer."

(38) At the reinstatement hearing, petitioner presented testimony from 19 character witnesses who attested that petitioner has been remorseful; is a man of honesty, personal integrity and good character; and has an excellent reputation for those traits in the community. In addition to Messrs. [D] and [H] and [I], petitioner's character witnesses were: [K]; [L], Esq.; [M], Esq.; [N]; [O]; [P]; [Q], C.P.A.; [R], D.P.M.

(39) The character witnesses who testified on petitioner's behalf represent a broad and prominent cross-section of the community (two certified public accountants, a police officer, the supervisor of the Adop-

tions Unit in the [ ] Court of Common Pleas, the director of a children's mental health services agency, nine businessmen/executives and six attorneys). These witnesses all hold petitioner in the highest regard despite his conviction and disbarment; they would—if petitioner were reinstated—utilize his services if the need arose or refer legal matters to him; and they believe that the community would welcome and the public interest would be served by petitioner's reinstatement to the bar.

(40) Moreover, all seven attorneys who testified—including the former assistant U.S. attorney who prosecuted petitioner—unanimously verified their belief that petitioner has the moral qualifications required for admission to the bar and that the resumption of the practice of law by petitioner will be neither detrimental to the integrity and standing of the bar or the administration of justice nor subversive of the public interest.

(41) At the reinstatement hearing, petitioner *expressed remorse, anguish and regret* for the conduct that led to his resignation and disbarment. Moreover, his grief and contrition for his past actions was independently confirmed by the prosecutor, his wife and others.

(42) Petitioner testified that he has learned from his past mistakes, now refuses to defer to anyone's wishes out of loyalty, and—if reinstated—will never again jeopardize his career and family by engaging in any type of illegal or unethical conduct in the future.

(43) The Hearing Committee finds that it is unlikely that petitioner will ever again engage in the type of conduct (or, for that matter, any illegal or unethical conduct) which led to his resignation and disbarment.

(44) Since his resignation and disbarment, petitioner has remained current, competent and learned in the

law by performing legal research and drafting legal memoranda, briefs and pleadings in his capacity as a paralegal for his current employer; by reading the [ ]—especially the case note, legal briefs and analysis sections—on a daily basis and by subscribing to and reading the [ ] *Reporter* advance sheets.

## CONCLUSIONS OF LAW

(1) The misconduct for which petitioner was disbarred is not so egregious as to preclude immediate consideration of his petition for reinstatement.

(2) Petitioner has met his burden of proving, by clear and convincing evidence, that he possesses the moral qualifications, competency and legal learning necessary to practice law in the Commonwealth of Pennsylvania.

(3) Petitioner's resumption of the practice of law will not be detrimental to the integrity of the bar, nor subversive of the interests of the public.

## DISCUSSION

The sole issue before the Disciplinary Board is whether petitioner's request for reinstatement to the Pennsylvania bar should be granted. Determining the correct answer to this question requires a two-step analysis.

The Disciplinary Board must first decide whether the conduct for which petitioner was disbarred was so egregious as to preclude possible reinstatement at this time. The threshold question in any reinstatement proceeding is whether a sufficient amount of time has passed since the misconduct occurred, during which the petitioner was engaged in a qualitative period of rehabilitation. See *Office of Disciplinary Counsel v. Keller,* 509 Pa. 573, 506 A.2d 872 (1986).

The initial point of inquiry when a disbarred attorney seeks reinstatement is whether the misconduct which led to disbarment is so patently offensive and contrary to the spirit of the bar that reinstatement is impossible. Indeed, there are certain acts of misconduct so repellent to the integrity of the bar and opposite the interests of the public that no amount of time or rehabilitation can cure the injustice the petitioner's reinstatement would cause. Therefore, when entertaining a prayer for readmission, "a review of the underlying offense is required as an initial step in determining eligibility for reinstatement." *Office of Disciplinary Counsel v. [S]*, 4 D.B. 76 at 4.

The question in the instant matter is whether petitioner's aiding and abetting his then employer's commission of mail fraud is so egregious as to forestall consideration of his readmission to the Pennsylvania bar. Although petitioner's misconduct is serious in nature and certainly warranted his 1984 disbarment, his erroneous actions are not so blatantly reprehensible as to obviate his possible return to the practice of law.

The facts of the instant matter buttress immediate consideration of his bid for reinstatement. The Office of Disciplinary Counsel has agreed with petitioner that his part in his former employer's mail fraud scheme was limited to his administrative role as the office manager, and at no point involved pecuniary gain. Although the fact that petitioner himself never perpetrated a fraud upon the court or undertook legal work on behalf of the fictitious clients for whom he was handling insurance settlements in no way exculpates him from responsibility for the mail fraud he engaged in, it is a point worth noting. Another crucial fact to note is that [F], Esq., the attorney who prosecuted the case involving petitioner, testified that petitioner cooperated fully with the

government, was remorseful, and that petitioner's reinstatement would not be detrimental to the integrity and standing of the bar.

The conclusion that petitioner's misconduct is not so heinous as to permanently banish him from the bar is also supported by Pennsylvania reinstatement case law. See *Office of Disciplinary Counsel v. [T]*, 26 D.B. 81, 7 D.&C.4th 260 (1990) (after disbarment for delivery of a bribe to a public official, offering false testimony under oath after a grant of immunity, failing to make appropriate disclosure to a federal grand jury and law enforcement officers, and "laundering" checks for a public official, the petitioner was subsequently reinstated); *In re [U]*, 49 D.&C.3d 298 (1988) (attorney reinstated after several convictions for making material untrue statements to the Office of Housing and Urban Development, fraudulent lot sales and mail fraud); and *Office of Disciplinary Counsel v. [V]*, Nos. 4 and 35 D.B. 79, 5 D.&C.4th 557 (1989) (attorney re-admitted after voluntary disbarment for unsatisfactory handling of client affairs).

The second query, in light of our decision that the instant petition for reinstatement is timely and properly before the Disciplinary Board, is whether a quantitative period of time has elapsed since disbarment, during which the petitioner has engaged in qualitative rehabilitation. *Office of Disciplinary Counsel v. Keller*, 509 Pa. 573, 506 A.2d 872 (1986); *Office of Disciplinary Counsel v. [V]*, Nos. 4 and 35 D.B. 79, 5 D.&C.4th 557 (1989).

Petitioner has been removed from the practice of law in Pennsylvania for a period of six and one-half years. The critical issue is whether petitioner has used this time for participation in meaningful rehabilitation for the problems which resulted in his disbarment.

"During this lengthy hiatus, petitioner has ... complied with all of the special conditions of his probation and paid a $4,000 fine that was imposed ... on October 27, 1985.... (He) also contributed 1,500 hours of community service at the [ ] Child Guidance Clinic." (Excerpt from a letter dated May 18, 1990, written by [W], U.S. probation officer, to an investigator for the Disciplinary Board of the Supreme Court of Pennsylvania.)

In addition to successfully fulfilling the terms of his probation, petitioner served three months at the [ ] Federal Prison Camp. Since his disbarment, petitioner has continued his volunteer work with the [ ] Child Guidance Clinic and [ ] Little League, obtained a realtor's license, and worked for a real estate firm, including handling escrow funds, and as a paralegal. All of this evidence leads to the conclusion that petitioner engaged in a qualitative period of rehabilitation over the duration of his disbarment and has therefore satisfied the *Keller* requirement.

The next hurdle for petitioner to overcome in order to be reinstated is compliance with Rule 218, Pa.R.D.E., which mandates that he demonstrate, with clear and convincing evidence, that he has the requisite moral qualifications and learning in the law expected of a Pennsylvania attorney and that his resumption of practice will not be subversive to the interests of the public nor offensive to the integrity of the bar. See Rule 218(c)(3)(i), Pa.R.D.E.

According to Pennsylvania case law, the petitioner may sustain his burden of proving moral qualification through the presentation of favorable testimony by well-respected sources. *Office of Disciplinary Counsel v. [V]*, Nos. 4 and 35 D.B. 79, 5 D.&C.4th 557 (1989); *In re [U], 49 D.&C.3d 298 (1986).*

Petitioner proffered a plethora of highly favorable testimony from 19 character witnesses who attested to his remorsefulness and positive moral character. Many of these witnesses were highly regarded members of the bar, including the attorney whose prosecution led to these proceedings. Finally, petitioner also presented a noncontroverted psychological evaluation which illustrated there is no psychological impediment to his resumption of the practice of law. Petitioner has satisfied his requirement of proving his moral fitness with the presentation of all of this evidence.

Petitioner also sustained his burden of demonstrating that he possesses the learning in the law required of a member of the Pennsylvania bar through his August 1989 attendance at the Pennsylvania Bar Institute basic practice course at [　] University and his employment as a paralegal, involved in legal research and drafting, as well as his daily reading of the [　] and subscription to the [　] *Reporter* advance sheets.

In light of petitioner's sincere remorse, his satisfaction of the *Keller* requirement, his compliance with the terms of Rule 218, Pa.R.D.E., and the fact that the Office of Disciplinary Counsel has no objection to petitioner's readmission to the Pennsylvania bar, we conclude that his reinstatement would not hinder the interests of the public nor jeopardize the integrity of the bar.

## RECOMMENDATION

The Disciplinary Board of the Supreme Court of Pennsylvania respectfully recommends that the instant petition for reinstatement be granted and petitioner be restored to the Pennsylvania bar. The board further recommends that all costs in connection with these proceedings be paid by petitioner.

Mr. Paris did not participate in the adjudication.

## ORDER

And now, December 11, 1991, upon consideration of the report and recommendations of the Disciplinary Board dated June 11, 1991, the petition for reinstatement is granted.

Pursuant to Rule 218(e), Pa.R.D.E., petitioner is directed to pay the expenses incurred by the board in the investigation and processing of the petition for reinstatement.